# UNITED STATES DISTRICT COURT

for the

Western District of Pennsylvania

| | |
|---|---|
| In the Matter of the Search of ) | |
| *(Briefly describe the property to be searched* ) | |
| *or identify the person by name and address)* ) | Case No. 10-140M |
| THE BUSINESS LOCATION OF ADALUC Inc d/b/a ) | [UNDER SEAL] |
| Pizza & Gyro Express Located at 11232 McKee ) | |
| Road, North Huntington, PA 15642 ) | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that there is now concealed on the following person or property located in the _____ Western _____ District of _____ Pennsylvania _____ *(identify the person or describe property to be searched and give its location):* See Attachment A.

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized):* See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of _____ 26 _____ U.S.C. § _____ 7201 _____ , and the application is based on these facts: See attachment.

☑ Continued on the attached sheet.

☐ Delayed notice of ___ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

J. Jeffrey Miller, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 3/24/10

City and state: PGH PA

_____
*Judge's signature*

Lisa Pupo Lenihan, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE SEARCHES OF:                      )
                                        )
THE BUSINESS LOCATION OF                )      NO. 10-140M
ADALUC Inc d/b/a Pizza & Gyro Express   )      [UNDER SEAL]
Located at 11232 McKee Road,            )
North Huntington, PA 15642              )

### AFFIDAVIT FOR SEARCH WARRANTS

I, Special Agent J. Jeffrey Miller (your affiant), being duly sworn, do hereby state as follows:

### INTRODUCTION

1.    I, J. Jeffrey Miller, have been a Special Agent with the United States Treasury Department, Internal Revenue Service Criminal Investigation (IRS-CI) since May of 1983. I am presently assigned to the Pittsburgh, Pennsylvania Field Office. I have received extensive training in the investigation and prosecution of criminal violations of the Internal Revenue Code, and have participated in numerous investigations that have lead to criminal prosecutions in the United States District Court. My responsibilities include the investigation of possible criminal violations of the Internal Revenue Code (Title 26, United States Code); the Money Laundering Control Act (Title 18, United States Code); The Bank Secrecy Act (Title 31, United States Code) and related offenses.

2.    I have previously been the affiant on search warrant affidavits and I have also participated in the execution of numerous search warrants. Those warrants authorized the search of

the residences and business offices of various subjects. Materials seized as a result of those searches have included records pertaining to the use and disposition of funds constituting evidence of income tax, structuring, and money laundering violations. During the past twenty-six years, I have conducted many investigations of individuals involved in legal and illegal businesses. These investigations have resulted in successful prosecutions for tax, money laundering and related offenses.

3. Based on my experience, knowledge and expertise, and my training, I have found that individuals and entities that conduct business, derive income, and incur expenses on a regular basis, maintain books and records of this activity. These records typically consist of journals, ledgers, quotes, invoices, receipts, loan documents, deposit tickets and cancelled checks, computerized spreadsheets, and other records showing the receipt and disposition of funds. Under modern business practices, such records are maintained both in electronic and paper form. I have found that business and personal records of income and expenses are ordinarily kept for long periods of time, often several years, in order to provide support for, among other things, financial and tax matters, to establish ownership for contractual liability purposes and for insurance purposes.

4. Your affiant has knowledge of the information that follows in this affidavit from the following: my training and

experience; my personal participation in this investigation; review of tax returns and Internal Revenue Service transcripts; review of Suspicious Activity Reports; statements made by Adam Lucas during a meeting with a Special Agent who was acting in an undercover capacity; statements made by John Summers that Lucas was utilizing to sell the restaurant known as Pizza & Gyro Express, and other sources of information further identified in this affidavit.

5. Internal Revenue Service-Criminal Investigation is conducting a criminal investigation of Adam Lucas (hereinafter Lucas), owner and operator of ADALUC Inc., d/b/a Pizza & Gyro Express Inc., and Pizza & Gyro Express Inc., for tax evasion. Tax evasion involves an individual's willful attempt, in any manner, to evade or defeat any tax imposed by Title 26, United States Code. In proving a tax evasion charge against LUCAS, it will be necessary to reconstruct his financial activities, determine the specific details of his scheme, and to identify other individuals with whom LUCAS conspired to evade the assessment of his income tax due and owing. The reconstruction of Lucas's financial activity necessitates a review and verification of Lucas's financial and business records.

6. This application and affidavit supports the issuance of search warrants for the business location of ADALUC Inc., d/b/a Pizza & Gyro Express located at 11232 McKee Road, North Huntington, PA 15642. The subject premise is a large commercial building

located at the intersection of McKee Road and Clay Pike. The subject premise is abutted by a parking lot on three sides and identified by a stand alone sign labeled Pizza & Gyro Express. A picture of the subject premise ·is contained in Attachment A, "Premise to be Searched," hereto.

7. This affidavit will show that there is probable cause to believe that during the period beginning as early as 2004, and continuing through the present, violations of Title 26, United States Code, Sections 7201 (personal and corporate income tax evasion) and 7206(1) and (2) (filing of false personal and corporate tax returns) were committed, and are continuing to be committed, in the Western District of Pennsylvania, by Lucas and entities owned and controlled by him.

8. This affidavit will further establish probable cause to believe that the documents and items detailed in Attachment B hereto are maintained at the subject premise and that these documents and items constitute evidence, fruits and instrumentalities of violations of Title 26, United States Code, Sections 7201 (personal and corporate income tax evasion) and 7206(1) and (2) (filing of false personal and corporate tax returns).

9. Because the investigation concerns tax liabilities and efforts to defeat the determination and collection of those liabilities, all records relating to financial transactions

affecting the subject's lawful income, business expenses, exemptions and deductions, their proper tax liabilities, and tax deficiencies for those years are relevant evidence. In addition, because Lucas has allegedly diverted currency from the business to conceal the nature and scope of his income producing activity, your affiant believes that the investigation may depend on documenting the dispositions of this currency for personal assets and expenses. Consequently, documents pertaining to personal expenses and the purchase of personal assets are relevant evidence. Since the documentation of expenditures requires exclusion of non-income sources for funds in possession of the subject, records of non-income transactions (e.g., inheritances, gifts, loans and loan repayments) are also relevant evidence.

## Background

10. This case originated with information provided by undercover shopper IRS Special Agent Jeremy Ashe. An IRS undercover shopper reviews the financial information provided relative to public sales offerings of businesses and attempts to identify businesses who stated income is higher than the reported income. The undercover shopper will on occasion contact a listing broker for additional information and evaluate for potential tax fraud. Special Agent Ashe made contact with John Summers (hereafter Summers), the broker that Lucas was utilizing to sell the restaurant known as Pizza & Gyro Express located at 11232 McKee

Road, North Huntington, PA 15642. Federal tax returns report that Lucas is the owner of ADALUC Inc., d/b/a Pizza & Gyro Express (EIN: 20-0091908) at 11232 McKee Road, North Huntington, PA 15642. According to the Pennsylvania Secretary of State website, LUCAS is the president of ADALUC, Inc. d/b/a PIZZA & GYRO EXPRESS, INC., which has an entity creation date of July 15, 2003. Adam Lucas purchased business location at 11232 McKee Road, North Huntington, PA 15642 on February 27, 2003. Lucas' returns were prepared using a calendar year.

11. During the conversation between Special Agent Ashe and Summers, Summers stated that the business had annual gross receipts of about $1,000,000. Summers indicated that all of the gross receipts are not reported on the tax returns. Summers estimated approximately $200,000 was not reported annually.

12. Internal Revenue Service-Criminal Investigation Undercover Agent Robert Liberto, acting as a prospective buyer, met with Lucas and Summers on December 15, 2009 at the Pizza & Gyro Express at 11232 McKee Road, North Huntington, PA 15642. During this meeting, LUCAS and Summers made numerous admissions that Lucas was skimming cash from the business and reporting one-half of his actual gross receipts on his returns.

13. Lucas was the owner of another restaurant that was also named Pizza & Gyro Express and was located in McKeesport PA. Lucas sold this restaurant in 2006, but retained the corporate entity

named Pizza & Gyro Express Inc. (EIN: 25-1846010) and continues to file yearly income tax returns. Federal income tax returns report that Lucas was/is the owner of Pizza & Gyro Express Inc. (EIN: 25-1846010) which reported limited "other" income of $14,480 in 2007 and no income in 2008. The 2005 and 2006 income tax returns list an address of 801 O'Neil Boulevard, McKeesport PA 15132 and contain substantial assets and liabilities on these returns. These returns report gross sales of $429,913 for 2005 and $410,218 for 2006. The 2006 corporate income tax return reports the sale of business property. The 2007 and 2008 corporate income tax returns report no assets or liabilities on the balance sheet and list an address of 1342 McKee Road, North Huntington, PA 15642. (This street number is the same address of Lucas's residence on his personal returns and is an incorrect address believed to be a mistake on the part of the return preparer. The actual address is 11304 McKee Road, North Huntington, PA 15642).

14. IRS transcripts indicate that the employees for ADALUC Inc., d/b/a Pizza & Gyro Express (EIN: 20-0091908) located at 11232 McKee Road, North Huntington, PA 15642 are being reported on Forms 941 filed with the Employer Identification Number of Pizza & Gyro Express Inc. (EIN: 25-1846010), and not under the Employer Identification Number of ADALUC Inc., d/b/a Pizza & Gyro Express (EIN: 20-0091908) for 2007 and 2008. Form 941's were not filed by ADALUC Inc., d/b/a Pizza & Gyro Express (EIN: 20-0091908) for the

years 2005 through 2008. The 2008 Form W-2 records list the paying entity as ADALUC Inc. at 11232 McKee Road, North Huntingdon PA, but the Form W-2's are remitted using the Employer Identification Number for Pizza & Gyro Express Inc (EIN: 25-1846010) and not ADALUC Inc., d/b/a Pizza & Gyro Express (EIN: 20-0091908).

15. ADALUC Inc., d/b/a Pizza & Gyro Express (EIN: 20-0091908) reports the revenue and expenses of this business on Form 1120 for 2007 and Form 1120S for 2008. The 2008 Form W-2 records list the paying entity as ADALUC Inc., at 11232 McKee Road, North Huntingdon PA, but the Form W-2's are remitted using the Employer Identification Number for Pizza & Gyro Express Inc. (EIN: 25-1846010) and not ADALUC Inc., d/b/a Pizza & Gyro Express (EIN: 20-0091908).

16. This Affidavit is submitted in support of an application for a warrant to search the premises known as Pizza & Gyro Express Inc., located at 11232 McKee Road, North Huntington, PA 15642, its curtilage, and any computer, or safe located therein.

## FACTS TO SUPPORT PROBABLE CAUSE

17. Special Agent Ashe made undercover contact with John Summers who was listed as a broker of Vested Business Brokers, a web based brokerage with listings of businesses that are for sale. Lucas was utilizing Vested Business Brokers to sell the restaurant known as Pizza & Gyro Express located at 11232 McKee Road, North Huntington, PA 15642. The asking price is $850,000. Federal tax

returns report that Lucas is the 100% owner of ADALUC Inc., d/b/a Pizza & Gyro Express. During the conversation between Special Agent Ashe and Summers, Summers stated that the business had annual gross receipts of about $1,000,000. Summers stated that all of the gross receipts are not reported on the tax returns. Summers estimated approximately $200,000 was not reported annually.

18. A brief general description of a Pizza & Gyro restaurant was contained on the Vested Business Brokers website with John Summers listed as the broker. Special Agent Ashe contacted Summers who provided him with a code to use to access specific information relative to the Pizza & Gyro restaurant. On August 18, 2009, Special Agent Ashe accessed this website, using the code provided by Summers, which identified the listed restaurant as the Pizza & Gyro Express, located at 11232 McKee Road, North Huntington, PA 15642 that tax returns have identified as ADALUC Inc., d/b/a Pizza & Gyro Express. The following financial overview of PIZZA & GYRO EXPRESS, INC. was listed on this site:

```
PIZZA & GYRO EXPRESS, INC.
Sales                $ 1,000,000.00
Other Income         $    30,000.00
Sales Tax            $    51,000.00
Total Revenues       $   979,000.00
Cost of Goods Sold   $   341,640.00
Gross Profit         $   637,360.00
```

19. The Vested Business Brokers web site listing of PIZZA & GYRO EXPRESS, INC. was again viewed on February 17, 2010 using the access code provided to Special Agent Ashe by Summers.    The

financial information provided, on this site, showed total revenues of $1,009,000, gross profit of $707,360 with an "owner's cash flow" of $300,984 after cash outlays.

20.    Internal    Revenue    Service-Criminal    Investigation Undercover (UC) Agent Robert Liberto made contact with Summers and attended a meeting with Lucas and Summers on December 15, 2009 at the Pizza & Gyro Express at 11232 McKee Road, North Huntington, PA. Special Agent Liberto wore a recording device.    Your affiant reviewed the recording of this meeting and the following are various statements made by Lucas during this meeting (all statements were made by LUCAS unless other wise noted):

a. Lucas stated he uses Diamond Touch (computer system) to keep track of the activity of the restaurant. Lucas reviewed this system with UC Agent Liberto in the office of the restaurant. Lucas stated it was a top notch system which he has been using for four years in this store.    Lucas showed UC Agent Liberto the server, also located on the premises, and stated that this is the main server where he does all the administration.    Lucas stated he can look at his system with a computer from anywhere in the country.

b. Lucas stated he used QuickBooks to prepare his payroll.    Lucas stated there is a number of ways to handle the cash, especially with employees. Lucas stated some (employees) get checks, some get a check and cash, and some get cash.

c. UC Agent Liberto stated that Lucas also produced a book and showed this book to him. Lucas (referring to this book) stated that this is his "bible right here" and this is where he keeps sales. Lucas further stated that he reports "half". UC Agent Liberto stated that Lucas accessed his computer system for the sales on January 13th and showed him the total sales for that day on the monitor. Lucas then showed him the sales entry for the same day in the book. UC Agent Liberto stated that the amount in the book was one-half of the amounts shown on the computerized system.

d. Lucas stated that you are reporting one-half, so you're profiting on the sales tax. Lucas further stated that that's another one of your pluses that in the real world does not exist. Lucas stated he thought about putting everything on the books and everyone on checks. Lucas stated the businesses would support it but he has been doing this for twelve years.

e. Lucas stated he sold his prior restaurant to his brother for $780,000 in 2006. Lucas stated that this restaurant had one million in sales for years and that he sold it at the top. The income tax returns of PIZZA & GYRO EXPRESS, INC. (EIN: 25-1846010) located at 801 O'Neil Boulevard, McKeesport PA, report receipts of $429,913 and $410,218 for 2005 and 2006, respectively. If, as Lucas represented that he reports "one-half", then the returns would be understated by $429,913 and $410,218 for 2005 and

2006, respectively.

f. John Summers advised UC Agent Liberto that they updated the financials. Summers stated the first profile was "straight line taxes" and had less income, so he told Lucas he needed to show what he averaged the last five years. Summers stated Lucas got more comfortable, so that's the profile we have now. Summers stated that the current profile shows one million dollars (of sales) and $200,000 to $300,000 is not on the profile. Summers then stated "I mean, you're not the IRS?"

g. Summers stated to Lucas that UC Agent Liberto was not interested in putting his money in the stock market and that he was looking for a place that generated a lot of cash flow-on and (is) off the books.

h. Lucas stated he purchased a customized Steelers chopper (motorcycle) right after their fifth Super Bowl victory. Lucas stated he met a number of Steelers. Lucas noted they were snobs and stated that he drives an Escalade, too, but you do not see him acting like that. Lucas stated that he had spent $120,000 restoring a vintage car. Lucas also stated that he built a "castle" with five bedrooms and made of all stone that is listed for sale for $849,000. Your affiant reviewed the Broker-1 Realty website which lists Lucas's residence at 11304 McKee Road for sale with an asking price of $849,000.

21. An IRS Form 8300, Report of Cash Payments Over $10,000

received in a Trade or Business, was received from Bill Staser Chevrolet. This report indicated that on November 17, 2006, Lucas provided $26,000 of currency to purchase a 2007 Chevrolet Corvette.

## SUMMARY OF TAX RETURN FILING HISTORY

22. Review of IRS transcripts of ADALUC Inc., d/b/a PIZZA & GYRO EXPRESS, INC. (EIN: 20-0091908) revealed the following:

| ADALUC Inc d/b/a PIZZA & GYRO EXPRESS, INC. | | |
|------|----------------|------------|
| Year | Gross Receipts | Net Income |
| 2005 | $412,924 | $5,793 |
| 2006 | $450,901 | $3,262 |
| 2007 | $487,413 | $27,409 |
| 2008 | $445,587 | $28,917 |

23. The gross receipts on the 2008 tax return of ADALUC Inc., d/b/a Pizza & Gyro Express Inc. of $445,587 are less than one-half of the gross receipts amount of $1,000,000 provided by Summers to Special Agent Ashe. Also, Lucas stated to UC Agent Liberto that he reported "one-half". Lucas showed UC Agent Liberto the sales total for January 13, 2009 on the computerized system. Lucas then showed him the sales entry for the same day in the book. UC Agent Liberto stated that the sales amount in the book was one-half of the sales amount shown on the computerized system.

24. The 2005, 2007, and 2008 ADALUC Inc. corporate returns were available for review. There is no signature on the 2005 return. The signatures on the 2007 and 2008 are illegible, but "President" is noted beside the signature. Lucas is listed as the

13

president of ADALUC Inc. on corporate filings with the state of Pennsylvania.

25. Review of the income tax returns of PIZZA & GYRO EXPRESS, INC. (EIN: 25-1846010) located at 801 O'Neil Boulevard, McKeesport PA, in 2005 and 2006, revealed the following:

| PIZZA & GYRO EXPRESS, INC. | | |
|------|---------------|--------------------------|
| Year | Gross Receipts | Ordinary Business Income |
| 2005 | $429,913 | $41,374 |
| 2006 | $410,218 | -$253,442[1] |
| 2007 | $14,480 | $13,104 |
| 2008 | 0 | 0 |

26. The 2005, 2006, 2007, and 2008 Pizza & Gyro Express, Inc. corporate returns were available for review. The signatures on the returns are illegible, but appear to be the same for each year and appear to be the same as the signatures on the 2007 and 2008 ADALUC Inc. returns. "Owner" is noted beside the signatures on the 2005 and 2006 returns and "President" is noted beside the signature on the 2007 and 2008 returns. Lucas and a Terry Grantz are listed as the president of ADALUC Inc. on various corporate filings with the state of Pennsylvania.

---

[1] Lucas advised UC Agent Liberto that he had sold his prior restaurant to his brother. The 2006 Form 1120S, U.S. Income Tax Return for an S Corporation, for PIZZA & GYRO EXPRESS, INC. (EIN: 25-1846010) contains a Form 4797, Sales of Business Property, which reports total gains from the sale of property of $369,435. This gain is not included in, and separate from, the $253,442 loss reported as Ordinary Business income.

27. When Lucas was discussing the underreporting of sales receipts with UC Agent Liberto, he stated he has been doing this for twelve years. Consequently, there is probable cause to believe that Lucas has not reported sales receipts on the returns of PIZZA & GYRO EXPRESS, INC., McKeesport Pa (EIN: 25-1846010) and ADALUC Inc., d/b/a PIZZA & GYRO EXPRESS, INC., North Huntingdon PA (EIN: 20-0091908). If Lucas was consistent, in prior years, with his method of underreporting his receipts by one-half of the actual receipts, then PIZZA & GYRO EXPRESS, INC. would have underreported receipts of approximately $429,913 and $410,218 for 2005 and 2006, respectively.

28. LUCAS files Form 1040 jointly with his wife, Donna L. Lucas, for the years 2005 through 2008. Review of IRS transcripts of the tax returns for Adam J. Lucas and Donna L. Lucas showed the following:

| North Huntingdon, PA Form 1040 | | | | |
|---|---|---|---|---|
| | 2005 | 2006 | 2007 | 2008 |
| Wages from ADALUC Inc[2] | $65,000.00 | $78,000.00 | $30,000.00 | |
| Interest | $27.00 | $28.00 | $189.00 | $89.00 |

---

[2] In 2005, 2006 and 2007, ADALUC Inc., d/b/a Pizza & Gyro Express filed as a corporation and wages were paid to Lucas from Pizza & Gyro Express Inc. In 2008, ADALUC Inc. filed as a Subchapter S corporation and reported the income on a Form K-1 issued to Lucas, the 100% owner. The returns of Pizza & Gyro Express Inc. and the ADALUC Inc., d/b/a Pizza & Gyro Express do not show dividends being paid during 2005 through 2008.

15

| | | | | |
|---|---|---|---|---|
| Business Income - Sch. C | ($971.00) | ($612.00) | | |
| Capital Gains - Sch. D | ($1,095.00) | $369,435.00 | $43,000.00 | |
| Rent | $30,251.00 | $30,624.00 | $29,633.00 | ($166.00) |
| Pizza & Gyro Express | $41,374.00 | ($253,442.00) | $13,104.00 | |
| ADALUC Inc | | | | $28,971.00 |
| Angelos | | | | $4,432.00 |
| Total Income | $134,586.00 | $224,033.00 | $115,926.00 | $33,326.00 |

## LIKELIHOOD OF RECORDS BEING MAINTAINED

29. Internal . Revenue Service-Criminal Investigation Undercover Agent Robert Liberto attended a meeting with Lucas and John Summers, on December 15, 2009, at the Pizza & Gyro Express located at 11232 McKee Road, North Huntington, PA. During this meeting, Lucas reviewed a computerized record keeping system, named Diamond Touch, with UC Agent Liberto. This system was located at the business and Lucas explained that this system tracked most of the income and expenses of the restaurant. Lucas also produced a book and stated he recorded one-half of his receipts in this book. This book was also located on the premises.

30. Additionally, based upon your affiant, Special Agent Miller's training, I know the following:

a. That persons engaged in schemes to defraud the IRS maintain books, records, receipts, notes, ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or

16

the transfer of funds and other papers relating to their investment of monies in various businesses. That the aforementioned books, records, receipts, notes, invoices, ledgers, etc., are maintained where such individuals have ready access to them, (i.e. offices and automobiles) and are necessary for an accurate reconstruction of taxable income and expenses.

b. That it is common for persons engaged in schemes to defraud the IRS to secrete evidence pertaining to unreported taxable income in secure locations within their offices and/or their businesses for their ready access and to conceal them from law enforcement authorities

c. That persons involved in schemes to defraud the IRS often use computers to maintain recordings of their invoices, assets, expenditures, liabilities, properties, bank/brokerage accounts, safe deposit boxes, storage units, inventories, financial transactions, and associates identification.

d. That persons involved in schemes to defraud the IRS commonly maintain addresses or telephone numbers in books or papers which reflect the names, addresses and/or telephone numbers of their associates. That these records are needed to keep track of names/identities of persons involved in financial transactions.

e. The historical documentation of assets, liabilities, and expenditures are important for use while investigating criminal violations of tax laws, allowing the government to rely on evidence

17

pertaining to prior years for use in supporting the limited range of years under investigation, particularly in utilizing an indirect method of proof to substantiate the violation.

f.    Finally, in regard to the retention of business records, Title 26, United States Code, Section 6001, requires that every person liable for any tax imposed by Title 26 shall keep records sufficient enough to show whether or not such person is liable for tax under this Title for six years.

## COMPUTER RELATED INFORMATION

31.  Due to the information gathered in this investigation, as well as our knowledge and experience with the wide use of computers in the operation of businesses of more than minimal size, there is probable cause to believe that evidence in this investigation has been recorded and stored electronically.

32.  In addition, IRS Special Agent Miller has discussed the case with IRS Special Agent William Massi, who is a Computer Investigative Specialist for the Internal Revenue Service. Special Agent Massi has been involved with the field of computer forensics since 2004 and has received training and attended numerous courses relating to this field at the Federal Law Enforcement Training Center (FLETC) and the ICE Cyber Crimes Center (3C). Special Agent Massi has attended yearly advanced training at the CI-Electronic Crimes lab facility in Alexandria, VA.

33.  Based upon my conversations with Special Agent Massi, I

know the following:

a. Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic optical or similar computer impulses or data. Hardware includes any data processing devices (such as central processing units and self contained "palm pilot," "laptop" or "notebook" computers); internal and peripheral storage devices (such as fixed disks, floppy disks, external hard disks, floppy disk drives, and diskettes, tape drives and optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communications devices (such as modems, cables and connections, recording equipment, speed dialers, programmable telephone dialing or signaling devices and electronic tone-generating devices); as well as any devices, mechanisms or parts that can be used to restrict access to computer hardware (such as physical lock and keys).

b. Computer software is digital information which can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical or other digital form. It commonly includes programs to run operating systems, applications, utilities, compilers, interpreters and communications programs.

c. Computer-related documentation consists of written,

recorded, printed or electronically stored material which explains or illustrates how to configure or use computer hardware, software of other related items.

d. Computer passwords or other data security devices are designed to restrict access to or hide computer software, documentation or data. Data security devices may consist of hardware, software, or other programming code. A password (which is a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys which perform certain preset security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

e. Computer hardware and computer software may be utilized to store information or data in the form of electronic magnetic coding on computer media or on media capable of being read by a computer or computer related equipment. This media includes but is not limited to fixed hard drives and removable hard drive cartridges, laser disks, floppy disks, CD ROM's and any other media capable of storing magnetic coding.

F. Based on my discussions with Special Agent Massi, I

20

know that computer operating system software records Internet access, E-mail receipts and transmissions, and file transactions in history and temporary files. These files can be maintained in the computer itself or on removable electronic storage media.

34. As described above and in Attachment B, this application seeks permission to search and seize records that might be found on the premises of Pizza & Gyro Express located at 11232 McKee Road, North Huntington, PA., in whatever form they are found. One form in which the records might be found is stored on a computer's hard drive or other storage media. Some of these electronic records might take the form of files, documents, and other data that is user-generated. Some of these electronic records, as explained below, might take a form that becomes meaningful only upon forensic analysis.

35. I submit that if a computer or storage medium is found on the premises, there is probable cause to believe those records will be stored in that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know from Special Agent Massi that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by

new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space-that is, in space on the storage medium that is not currently being used by an active file-for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media-in particular, computers' internal hard drives-contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

36. Based on the personal observations of UC Agent Liberto, I am aware that computer equipment was used to generate, store, and print documents used in the tax evasion scheme. There is reason to believe that there is a computer system currently located on the premises of Pizza & Gyro Express located at 11232 McKee Road, North Huntington, PA.

37. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for evidence that establishes how computers were used, the purpose of their use, who used them, and when.

38. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as accounting records, word processor, picture, and movie files), computer storage media can contain other forms of electronic evidence as well:

a. Forensic evidence of how computers were used, the purpose of their use, who used them, and when, is, as described further in Attachment B, called for by this warrant. Data on the storage medium not currently associated with any file can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example,

23

registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, and correspondence (and the data associated with the foregoing, such as file creation and last accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance with particularity a description of the records to be sought, evidence of this type often is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand the evidence described in Attachment B also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, I know from training and experience that it is possible that malicious software can be installed on a computer, often without the computer user's knowledge, that can allow the computer to be used by others, sometimes without the knowledge of the computer owner. Also, the presence or absence of counter-forensic programs (and associated data) that are designed to eliminate data may be relevant to establishing the user's intent. To investigate the crimes described in this warrant, it might be necessary to investigate whether any such malicious software is present, and, if so, whether the presence of that malicious software might explain the

presence of other things found on the storage medium. I
mention the possible existence of malicious software as
a theoretical possibility, only; I will not know, until
a forensic analysis is conducted, whether malicious
software is present in this case.

39. Searching storage media for the evidence described in the
attachments may require a range of data analysis techniques. It is
possible that the storage media located on the premises will
contain files and information that are not called for by the
warrant. In rare cases, when circumstances permit, it is possible
to conduct carefully targeted searches that can locate evidence
without requiring a time-consuming manual search through unrelated
materials that may be commingled with criminal evidence. For
example, it is possible, though rare, for a storage medium to be
organized in a way where the location of all things called for by
the warrant are immediately apparent. In most cases, however, such
techniques may not yield the evidence described in the warrant.
For example, information regarding user attribution or Internet use
is located in various operating system log files that are not
easily located or reviewed. As explained above, because the
warrant calls for records of how a computer has been used, what it
has been used for, and who has used it, it is exceedingly likely
that it will be necessary to thoroughly search storage media to
obtain evidence, including evidence that is not neatly organized
into files or documents. Just as a search of a premises for
physical objects requires searching the entire premises for those

objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant. Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

40. Based upon my conversations with Special Agent Massi, I know that a thorough search for information stored in storage media often requires agents to seize most or all storage media to be searched later in a controlled environment. This is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. Additionally, to properly examine the storage media in a controlled environment, it is often necessary that some computer equipment, peripherals, instructions, and software be seized and examined in the controlled environment. This is true because of the following:

    a. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable.

    b. The volume of evidence. Storage media can store the equivalent of millions of pages of information.

Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

c. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

d. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

41. In light of these concerns, I hereby request the Court's permission to seize the computer hardware, storage media, and associated peripherals that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the hardware for the evidence described, if, upon arriving at the scene, the agents executing the search conclude that it would be impractical to search the hardware, media, or peripherals on-site for this evidence.

42. I recognize that ADALUC Inc., d/b/a Pizza & Gyro Express

27

(EIN: 20-0091908) at 11232 McKee Road, North Huntington, PA 15642 (the PREMISES) is a functioning company with many employees, and that a seizure of the Company's computers may have the unintended effect of limiting the Company's ability to provide service to its legitimate customers. In response to these concerns, the agents who execute the search anticipate taking an incremental approach to minimize the need to seize equipment. It is anticipated that, barring unexpected circumstances, this incremental approach will proceed as follows:

    a. The agents will attempt to create an electronic "image" of those parts of the computer that are likely to store the things described in the warrant. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Imaging a computer permits the agents to obtain an exact copy of the computer's stored data without actually seizing the computer hardware. The agents or qualified computer experts will then conduct an off-site search for the things described in the warrant from the "mirror image" copy at a later date. If the agents successfully image the Company's computers, the agents will not conduct any additional search or seizure of the Company's computers.

    b. If imaging proves impractical, or even impossible for technical reasons, then the agents will seize those components of the Company's computer system that the agents believe must be seized to permit the agents to locate the things described in the warrant at an off-site location. The seized components will be removed from the PREMISES. If employees of the Company so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Company's legitimate business. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

The information contained within this affidavit and all attachments thereto are true and correct to the best of my knowledge, information, and belief.

J. Jeffrey Miller, Special Agent
Internal Revenue Service
Criminal Investigation

Sworn and subscribed to before me
this _24th_ day of _March_ 2010.

UNITED STATES MAGISTRATE JUDGE

<u>Attachment A</u>



The subject premise as pictured above is described as a large commercial building located at the intersection of McKee Road and Clay Pike in North Huntington, Pennsylvania which is abutted by a parking lot on three sides and identified by a stand alone sign labeled Pizza & Gyro Express and includes its curtilage, its computers and any safe located therein.

All records relating to violations of Title 26, United States Code, Sections 7201 (personal and corporate income tax evasion), and 7206(1) and (2) (filing of false personal and corporate tax returns) by Adam and Donna Lucas and ADALUC Inc., d/b/a Pizza & Gyro Express Inc. and Pizza & Gyro Express Inc. in North Huntington, Pennsylvania and in McKeesport, Pennsylvania (hereinafter the Company) for the period starting January 1, 2003 to the present, including;

a. Any and all books, records, documents, correspondence, memoranda, receipts, notes, ledgers, and other papers relating to income and expenses of Adam and Donna Lucas and the business operation of ADALUC Inc., d/b/a Pizza & Gyro Express Inc. and the business operation of Pizza & Gyro Express Inc. in North Huntington, Pennsylvania and in McKeesport, Pennsylvania for the period starting January 1, 2003 to the present;

b. All books, records, receipts, bank statements and brokerage statements, money drafts, letters of credit, money order and cashier's check receipts, passbooks, bank checks, settlement sheets, closing statements, sales agreements, investment agreements, partnership agreements, and other items evidencing the receipt, secretion, transfer, and/or concealment of domestic and/or foreign assets and the receipt, secretion, transfer, concealment, and/or expenditure of money for Adam and Donna Lucas and ADALUC

Inc. d/b/a Pizza & Gyro Express Inc., and for Pizza & Gyro Express Inc. in North Huntington, Pennsylvania and in McKeesport, Pennsylvania, for the period starting January 1, 2003 to the present;

c. Indicia of occupancy, residency, rental and/or ownership of the premises described herein, including but not limited to, utility and telephone bills, cancelled envelopes, rental, and/or purchase, and/or lease agreements, and keys;

d. Any and all general journals, cash receipt journals, cash disbursement journals, sales journals, general ledgers and subsidiary ledgers which include, but are not limited to, notes receivables, accounts receivables, accounts payable, notes payable, and closing ledgers for Adam and Donna Lucas and the business operation of ADALUC Inc., d/b/a Pizza & Gyro Express Inc. and the business operation of Pizza & Gyro Express Inc. in North Huntington, Pennsylvania and in McKeesport, Pennsylvania for the period starting January 1, 2003 to the present;

e. Any and all receipts, invoices, shipping documents, notes and correspondences relative to any mailing, land and/or air shipment, and/or express package/mail delivery service including those from which it may be determined the dates, times, and addresses of any correspondences or shipments to Adam and Donna Lucas and ADALUC Inc. d/b/a Pizza & Gyro Express Inc. and for Pizza & Gyro Express Inc. in North Huntington, Pennsylvania and in

B2

McKeesport, Pennsylvania , for the period starting January 1, 2003 to the present;

f. Any and all statements, deposit slips, withdrawal slips, and cancelled checks for any and all bank accounts for Adam and Donna Lucas or ADALUC Inc. d/b/a Pizza & Gyro Express Inc., and for Pizza & Gyro Express Inc. in North Huntington, Pennsylvania and in McKeesport, Pennsylvania, including all funds on deposit such as certificates of deposit, money market accounts, stock brokerage accounts, and bank safety deposit box records and keys, for the period starting January 1, 2003 to the present;

g. All records of brokerage accounts including all agreements, contracts, applications for account, signature cards, all records relative to treasury notes or certificates of deposit purchased, cash accounts, ready asset accounts, mutual fund accounts, commodity accounts, margin accounts, or other accounts for Adam and Donna Lucas and ADALUC Inc. d/b/a Pizza & Gyro Express Inc., and for Pizza & Gyro Express Inc. in North Huntington, Pennsylvania and in McKeesport, Pennsylvania. Such records include cash receipts, confirmation slips, securities delivered receipts, statements of account, notifications of purchase or sale, representative's stock record, account executive worksheets, correspondence, ledger sheets, cash in slips, buy and sell slips, or other records of these transactions, for the period starting January 1, 2003 to the present;

h.  Any and all financial statements, bookkeeper's and/or accountant's work papers used in the preparation of individual tax returns; retained copies of all federal, state, and local income tax returns; retained copies of all federal, state, and local, income, payroll and excise tax returns, including but not limited to Forms 1040, 1065, 1099, 1120, and/or 1120S, 940, 941, W-2, and W-3, filed or not filed, for Adam and Donna Lucas and ADALUC Inc. d/b/a Pizza & Gyro Express Inc., and for Pizza & Gyro Express Inc. in North Huntington, Pennsylvania and in McKeesport, Pennsylvania,  for the period starting January 1, 2003 to the present;

i.  Photographs, including still photos, negatives, videotapes, films, undeveloped film and the contents therein, in particular, photographs of domestic and foreign assets;

j.  Address and/or telephone books, Rolodex indices and any papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers of co-conspirators, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

All of the foregoing items of evidence above are subject to seizure pursuant to this warrant in whatever form, and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing,

B4

painting); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

k. The agents may attempt to create an electronic "image" of those parts of any computers or electronic storage media of the Company that are likely to store the things described above in this warrant; that is, to take a complete electronic picture of the computer's data, including all hidden sectors and deleted files. The agents or qualified computer experts will then conduct an off-site search for the things described in the warrant from the "mirror image" copy at a later date. If the agents successfully image the Company's computers, the agents will not conduct any additional search or seizure of the Company's computers.

l. If imaging proves impractical, or even impossible for technical reasons, then the agents will seize those components of the Company's computer system or electronic storage media that the agents believe must be seized to permit the agents to locate the things described in this warrant at an off-site location. The seized components will be removed from the PREMISES described in Attachment A. If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return them within a reasonable time.

m. For any of the Company's computers, computer hard

drives, or other physical objects upon which computer data can be recorded that is called for by this warrant, or that might contain things otherwise called for by this warrant:

1.  evidence of who used, owned, or controlled the Company's computers, computer hard drives, or other physical objects at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

2.  evidence of software that would allow others to control the Company's computers, computer hard drives, or other physical objects , such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

3.  evidence of the lack of such malicious software;

4.  evidence of the attachment to the Company's computers, computer hard drives, or other physical objects of other storage devices or similar containers for electronic evidence;

5.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Company's computers, computer hard drives, or other physical objects;

6.  evidence of the times the Company's computers, computer hard drives, or other physical objects were used;

7.  passwords, encryption keys, and other access devices that may be necessary to access the Company's computers, computer hard drives, or other physical objects;

8.  documentation and manuals that may be necessary to access or to conduct a forensic examination of the Company's computers, computer hard drives, or other physical objects;

9.  contextual information necessary to understand the evidence described in this attachment.